UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**Wild Goose Enterprises, Inc.,**

      *Plaintiff,*

v.                                                                     Case No. 3:20-cv-340
                                                                              Judge Thomas M. Rose

**Iron Flame Technologies, Inc.,**

      *Defendant.*

---

**ENTRY AND ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT. (ECF 14).**

---

Pending before the Court is Motion to Dismiss First Amended Complaint. ECF 14. Therein, Defendant Iron Flame Technologies, Inc. asserts that Plaintiff Wild Goose Enterprises, Inc. has failed to properly allege a claim of breach of contract or a claim of breach of implied covenant of good faith and fair dealing. Because the claims are properly stated, the motion will be denied.

**I.    Background**

Plaintiff Wild Goose is an Ohio corporation with its principal place of business in Vandalia, Ohio. ECF 13, First Amended Complaint, ¶ 1. Defendant Iron Flame is a Delaware corporation with its principal place of business in Baltimore, Maryland. Id., ¶ 2. Iron Flame is a prime contractor with the United States Air Force for its Data Center Consolidation Initiative and related software functionality. ECF 13, First Amended Complaint, ¶¶ 6-7. Wild Goose was a

subcontractor on that project, engaged to provide software development, data initiative, and related services to Iron Flame in connection with performance under the prime contract. Id. The parties entered a contract on January 12, 2017 (id., ¶ 4) and two "updated" contracts, the most recent one of which is dated March 19, 2020. Id., ¶¶ 4, 8; ECF 14-1, Exhibit 1 (January 12, 2017 Sub-Contract Agreement); ECF 9-2, Exhibit A (March 19, 2020 Subcontractor Agreement).[1] By agreement, the Contract is governed by Delaware law. ECF 14-1, Exhibit 1, ¶ 23; ECF 9-2, Exhibit A, ¶ 22.

On May 15, 2019, Iron Flame sent an email to three of Wild Goose's employees. ECF 13, First Amended Complaint, ¶ 11; ECF 9-3, Exhibit B. Wild Goose alleges that the recipients of Iron Flame's May 15, 2019 email, Randy Brooks, Mike Kender, and John Covey, subjectively "understood the emails to be a solicitation of employment." ECF 13, First Amended Complaint, ¶¶ 11-12; see also ECF 9-3, Exhibit B. That same day, Wild Goose responded to Iron Flame, asserting that its request that Brooks, Kender, and Covey become consultants to Iron Flame violated the non-solicitation language of their contract. ECF 13, First Amended Complaint, ¶ 13; ECF 9-3, Exhibit B.

Indeed, Paragraph 14 of the applicable January 12, 2017 Contract states, in part:

> Unless otherwise agreed to in writing, the parties hereto agree that during the term of this Sub-contractor Agreement and for a period of one (1) year after the expiration or termination of this Sub-contractor Agreement, neither party shall solicit for employment any person employed by the other working under this Agreement.

---

[1] Pursuant to Fed. R. Civ. P. 10(c), an instrument that is an exhibit to a pleading is "a part of the pleading for all purposes." If a complaint "references or quotes certain documents, … a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); accord, *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (holding that defendant could attach to and rely in its motion to dismiss group health plans referenced in the complaint because it asserted rights under the plans).

ECF 14-1, Exhibit 1 at 3.

Iron Flame replied the same day, clarifying that it had "NO interest" in soliciting Brooks, Kender, and Covey for employment. ECF 13, First Amended Complaint, ¶ 14; ECF 9-3, Exhibit B (Emphasis in Original).

The email that allegedly violated the non-solicitation term of the Contract was sent May 15, 2019 at 10:47 a.m. from Iron Flame's Facility Security Officer, Myisha Nasir, who explained that, because of a "Security Vulnerability Assessment" by the U.S. Air Force, Iron Flame "can no longer hold [security] clearances for individuals" such a Brooks, Kender, and Covey who are not Iron Flame employees. ECF 9-3, Exhibit B; ECF 14-2, Exhibit 2. Nasir stated that, while Iron Flame's senior management thought "the best option" was for Brooks, Kender, and Covey "to become consultants to Iron Flame" so that it could continue to hold their clearances "while [they] were] "working on the program," she was "still exploring other options." Id. Wild Goose's principal point of contact with Iron Flame, Walt Schroeder, replied at 11:57 a.m. that day that he was "amazed" by questions from Brooks, Kender, and Covey about Iron Flame's purported "solicitation of their services as consultants." Id.

Iron Flame's principal, Tarik Nasir, responded, stating Iron Flame "has not made any such offer to Wild Goose employees," but instead had informed them that "Iron Flame will [no] longer be able to hold their clearances unless they became Iron Flame employees or 1099s." Id. Nasir emphasized, "Iron Flame has NO interest in soliciting [Wild Goose] employees. However, please note that Iron Flame will be removing all [Wild Goose] employees from our facility due to the findings in our recent audit." Id.

Iron Flame asserts that the contract establishes a right to direct the manner in which Wild Goose performs its duties under the Contract:

3

> 3. The Prime Contractor agrees to employ the services for the Sub-Contractor as Consultants to perform tasks related to the above duties. The Sub Contractor agrees to be subject to the general supervision of and act pursuant to the orders, advice and direction of the Prime Contractor.
>
> 4. The Sub-Contractor agrees to abide by the Prime Contract's [sic] rules, regulations, and practices including those concerning work schedules, deliverables, and communications as they may from time to time be adopted or modified.

ECF 9-2, PageID 114, Exhibit A at 2.

> The Contract does mention the possibility of travel:
>
> 6. The Prime Contractor will <u>not</u> reimburse the Sub-Contractor for expenses incurred by the Sub-Contractor without prior written consent while traveling pursuant to the Prime Contractors' directions."

Id. (emphasis in original).

On June 2, 2020, Iron Flame notified Wild Goose that Iron Flame had decided "to have all roles associated with the … contract be performed at Iron Flame's Baltimore Headquarters," with the transition to be completed by June 30, 2020. ECF 9-4, Exhibit C at 3. Wild Goose took the position that Iron Flame's direction was a "request[]" for a "change to our negotiated contract, as per paragraph 21 of the subcontract." Id. at 1.

On June 12, 2020, Iron Flame issued a "stop work" order, effective the same day, because Wild Goose would not devote its full-time efforts to the project and for "other professional considerations." ECF 13, First Amended Complaint, ¶ 21. The same day, Wild Goose "issued a cure notice … in response to the 'stop work' order." Id., ¶ 22. The Amended Complaint alleges Iron Flame "materially breached the Contract by failing to respond to Plaintiff's cure notice within 10 days of June 12, 2020," which allegedly is "mandated" and "required per provision 15 in the Contract." Id., ¶¶ 23, 29.

4

Paragraph 15 of the Contract provides, in part:

> 15. Either party may terminate if (i) the other party fails to perform a material obligation of the Agreement and such failure remains uncured for a period of 10 days after receipt of notice from the non-breaching party specifying such failure; ….

ECF 9-2, PageID 116, Exhibit A at 4.

On June 29, 2020, Plaintiff Wild Goose Enterprises, Inc. ("Wild Goose") filed a Complaint against Iron Flame in the Court of Common Pleas, Montgomery County, Ohio. On August 11, 2020, Iron Flame removed the action to this Court. Wild Goose's Amended Complaint asserts one count of breach of contract (1) by attempting to solicit consulting services from Plaintiff's employees; (2) by unilaterally imposing scope and location changes to Plaintiff's operations culminating with a "stop work" order; and (3) by failing to respond to Plaintiff's cure notice. ECF 13, PageID 173, ¶¶ 27, 28, 29. A second count asserts breach of implied covenant of good faith and fair dealing "by engaging in oppressive, underhanded tactics designed to frustrate the ability of Plaintiff to perform," by "undermined Plaintiff's business operations, beginning with its heavy-handed negotiations to amend the agreement between the parties and reduce the compensation that was to be paid to Defendant, followed by it attempting to appropriate Plaintiff's key personnel in violation of the agreement, and culminating in Defendant's unilateral, unreasonable, and unnecessary demand to move the location of Plaintiff's business operations out-of-state," and "Defendant's attempts to impose scope and location changes upon Plaintiff's business operations, along with its attempts to procure Plaintiff's employees as "consultants," were a conscious artifice by Defendant calculated to impair Plaintiff's ability to perform its duties under the contract. These actions were employed by Defendant to attempt to force Plaintiff into breaching the parties' contract." ECF 13, PageID 173-74, ¶¶ 32, 33, 34.

Wild Goose maintains that Iron Flame breached the Contract "as a result of its attempt to unilaterally impose scope and location changes to Plaintiff's operations." ECF 13, First Amended Complaint, ¶ 28. Iron Flame counters with a claim that Wild Goose is "subject to" and "agrees to abide by" Iron Flame's supervision, orders, direction, rules, regulations, and practices, including those relating to work schedules, deliverables, and communications, "as they may from time to time be adopted or modified," ECF 9-2, PageID 114, Exhibit A at 2, even to the extent of ordering the contract to be fulfilled in Baltimore.

**II.     Standard**

"The purpose of a Rule 12(b)(6) motion to dismiss is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 897 (S.D. Ohio 2013) (citing *Mayer v. Mylod*, 988 F. 2d 635, 638 (6th Cir. 1993)). Moreover, the purpose of the motion is to test the formal sufficiency of the statement of the claim for relief. *Id.* "[F]or the purposes of a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff and its allegations taken as true." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232 (1974)).

To survive a 12(b)(6) motion to dismiss, a plaintiff must provide more than labels and conclusions; a formulaic recitation of the elements of a cause of action is not enough. *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). Further, the factual allegations must be enough to raise a right to relief above the speculative level and must also do something more than merely create a suspicion of a legally cognizable right. *Id.* However, the Court is not bound to accept as true a legal conclusion couched as factual allegation or unwarranted factual inferences. *Id.* at 555; *Morgan v. Church's Fried Chicken*, 829 F. 2d 10, 12 (6th Cir. 1987); *See also Ashcroft v.*

*Iqbal*, 556 U.S. 662 (2009). Moreover, only well-pleaded facts are construed liberally in favor of the party opposing the motion to dismiss. *Lillard v. Shelby County Bd. Of Educ.*, 76 F. 3d 716, 726 (6th Cir. 1996).

### III. Analysis

Wild Goose asserts Iron Flame breached the Contract in three ways: "as a result of its attempt to solicit consulting services from Plaintiff's employees on May 15, 2019"; "as a result of its attempt to unilaterally impose scope and location changes to Plaintiff's operations, beginning on June 1, 2020"; and "by failing to respond to Plaintiffs' cure notice within 10 days of June 12, 2020." ECF 13, First Amended Complaint, ¶¶ 27-29. Defendant asserts none of Iron Flame's alleged conduct supports a plausible claim under these theories.

Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs. *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011) (citing *WaveDivision Holdings, LLC v. Millennium Digital Media Systems, L.L.C.*, Civ. No. 2993–VCS, 2010 WL 3706624, *13 (Del.Ch.2010) and *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del.Ch.2003)). The essential elements of a claim for breach of the implied covenant of good faith and fair dealing in Delaware are "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Cantor Fitzgerald, L.P. v. Cantor*, No. 16297, 2000 WL 307370, at *15 n. 51 (Del.Ch. March 17, 2000) ACE & Co. v. Balfour Beatty PLC, 148 F. Supp. 2d 418, 426 (D. Del. 2001)

In addressing issues of contract interpretation, the court must "give effect to the plain-meaning of [a] contract's terms and provisions." *LCY Chemical Corp. v. Kraton Performance Polymers, Inc.*, No. 14-1279 (GMS), 2015 WL 4486783, at *2 (D. Del. July 23, 2015) (quoting

7

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60) (Del. 2010). If contractual language "is plain and clear on its face, i.e., it[ ] ... conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *Choupak v. Rivkin*, No. 7000 VCL, 2015 WL 1589610, at *18 (Del. Ch. Apr. 6, 2015) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)). If, however, the terms are ambiguous, extrinsic evidence may be considered to determine the parties' intentions. See *AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008).

Ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Markow v. Synageva Biopharma Corp.*, No. N15C–06–152 WCC, 2016 WL 1613419, at *5 (Del. Super. Ct. Mar. 3, 2016) (internal quotations omitted). At the motion to dismiss stage, the Court "cannot choose between two differing reasonable interpretations of ambiguous provisions." Id. (quoting *VLIW Technology*, 840 A.2d at 615). "Dismissal is proper only if the defendant's] interpretation is the only reasonable construction as a matter of law." Id. (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)). "When parties present differing – but reasonable – interpretations of a contract term, the Court turns to extrinsic evidence to understand the parties' agreement. Such an inquiry cannot proceed on a motion to dismiss." Id. (quoting *Remo Grp., Inc. v. MacAndrews AMG Hldgs., LLC*, No. 7668 VCN, 2015 WL 394011, at *5 (Del. Ch. Jan. 29, 2015)). See also *Novel Drug Sols., LLC v. Imprimis Pharms., Inc.*, No. CV 18-539 (MN), 2018 WL 4795627, at *3 (D. Del. Sept. 26, 2018).

While Defendant asserts Wild Goose's "solicit[ing] consulting services" allegation is disproved by its own Complaint, the Complaint is not evidence. Discovery may show an attempt by Defendant to poach employees. The Complaint alleges Nasir directly solicitated Wild Goose

8

employees to "become consultants for Iron Flame." What damages defendant might have from this are not known, but Plaintiff's allegations in the Complaint concerning the May 15, 2019 communication raises a reasonable inference Defendant is liable for the misconduct alleged, i.e., breach of Paragraph 14 of the parties' agreement.

As regards location of performance, Plaintiff alleges Defendant "attempt[ed] to unilaterally impose scope and location changes to Plaintiff's operations, beginning on June 1, 2020." ECF 6-1, PageID 50. The contract appears silent on location of performance, leaving open to discovery whether there was any meeting of the minds concerning where the contract would be performed. At this stage, the Court does not find the plain meaning of the contract to give Defendant the authority to demand that Plaintiff relocate from Dayton to Baltimore. This assertion is a strained reading of: "4. The Sub-Contractor agrees to abide by the Prime Contract's rules, regulations, and practices, including those concerning work schedules, deliverables, and communications as they may from time to time be adopted or modified." ECF 6-1, PageID 51.

Indeed, the Contract also contains a provision concerning modifications:

> Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

ECF 6-1, PageID 54. Notably, the Court does not see an integration clause in the contract, leaving the meaning of these provisions open to interpretation by means of extrinsic evidence to resolve ambiguities. Had the parties intended to contract the place of performance, the Court would expect a more explicit provision. See, e.g., *In re Glob. Computer Enterprises, Inc.,* No. 14-13290-BFK, 2017 WL 3580171, at *2 (Bankr. E.D. Va. Aug. 15, 2017).

**IV.     Conclusion**

9

Because the First Amended Complaint properly alleges that Defendant breached their contract by soliciting employees and because the First Amended Complaint also properly asserts Defendant breached the implied covenant of good faith and fair dealing by demanding performance in Baltimore, Defendant's Motion to Dismiss First Amended Complaint, ECF 14, is **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, April 26, 2021.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE